**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
THE JUDGE ROTENBERG EDUCATIONAL
CENTER INC.,

<table>
<tr><td>Plaintiff,</td><td><b>MEMORANDUM OF</b></td></tr>
<tr><td></td><td><b>DECISION AND ORDER</b></td></tr>
<tr><td>-against-</td><td>10-cv-3628 (ADS)(ARL)</td></tr>
</table>

GREGORY J. BLASS, Commissioner, Suffolk
County Department of Social Services in his
Official Capacity, and SUFFOLK COUNTY,

                        Defendants.
-------------------------------------------------------X

**APPEARANCES:**

**Jocelyne S. Kristal, Esq.**
*Attorney for the Plaintiff*
19 Court Street
Third Floor
White Plains, NY 10601

**Suffolk County Attorney Christine Malafi**
*Attorneys for the Defendants*
100 Veterans Memorial Highway
PO Box 6100
Hauppauge, NY 11788
        By:    Assistant County Attorney Drew W. Schirmer

**SPATT, District Judge.**

The Plaintiff in this case, The Judge Rotenberg Educational Center Inc. ("JRC"), seeks

payment from the Defendants Suffolk County and the Suffolk County Department of Social

Services ("DSS") for educational and housing services that the JRC provided to a disabled young

woman from December 5, 2008 to December 15, 2009.  The Defendants now move for judgment

on the pleadings, dismissing the Plaintiff's claims against them.  For the reasons that follow, the

Court denies the Defendants' motion.

1

## I. BACKGROUND

The Court previously detailed the facts of this case in an order denying the Defendants' motion to dismiss for failure to serve a timely notice of claim.  However, the Court will restate the relevant facts for purposes of the present motion.

The JRC is a Massachusetts non-profit corporation that owns and operates a live-in school for individuals with severe emotional, psychiatric, and behavioral problems, coupled with developmental disabilities.  On April 11, 2007, the JRC agreed to care for a nineteen-year-old emotionally and developmentally disabled woman referred to as RP, who had been recently placed in the care and custody of the Suffolk County DSS by a New York State Family Court Judge.  The Suffolk County DSS agreed to pay tuition to the JRC for this placement.

Generally, the Suffolk County DSS only provides services for individuals until their twenty-first birthday.  See N.Y. Soc. Serv. Law § 398(6)(h) ( "Commissioners of public welfare and city public welfare officers responsible under the provisions of a special or local law for the children hereinafter specified shall have powers and perform duties as follows: . . . Supervise children who have been cared for away from their families until such children become twenty-one years of age or until they are discharged to their own parents, relatives within the third degree or guardians, or adopted."); see also Vega v. Fox, 457 F. Supp. 2d 172, 185 n.88 (S.D.N.Y. 2006).  However, pursuant to Social Services Law § 398(13):

> (a) In the case of a child with a handicapping condition who is placed, pursuant to this chapter, in a foster care agency or institution located outside the state, and who attains the age of eighteen, the social services official shall:
> (ii) assess the nature of the services required;
> (iii) notify the parent or guardian of such child's need for services; and
> (iv) upon the written consent of the parent or guardian . . submit a report on the child's need for services after age twenty-one to the department for planning purposes.

> (b) Upon the written consent of the parent or guardian, the department shall submit the report received pursuant to paragraph (a) of this subdivision to the council on children and families.
>
> (c) When a child's report is submitted to the council on children and families pursuant to this subdivision, the council shall cooperate with adult service providers, such as the department of social services, the office of mental retardation and developmental disabilities, the office of mental health and the office of vocational rehabilitation of the education department in planning and coordinating such child's return to New York state for adult services. The council shall arrange with the appropriate state agency for the development of a recommendation of all appropriate in-state programs operated, licensed, certified or authorized by such agency and which may be available when such child attains the age of twenty-one. . . .

Thus, the Suffolk County DSS's responsibilities for RP included assisting her in obtaining appropriate adult social services to commence when she turned twenty-one. To this end, on December 7, 2007, approximately six months before RP's twenty-first birthday, which was on June 30, 2008, the Suffolk County DSS and the JRC filed paperwork with the New York State Office of Mental Retardation and Developmental Disabilities ("OMRDD"), seeking adult social services for RP from the OMRDD. See Flowers v. Webb, 575 F. Supp. 1450, 1453 (E.D.N.Y. 1983) ("New York State's Mental Hygiene Law ("MHL") §§ 13.01 and 33.03 entitle mentally retarded citizens of New York to care, treatment and rehabilitation. MHL § 13.07 delegates this responsibility to the OMRDD, an autonomous office within the State Department of Mental Hygiene.").

However, on June 25, 2008, just five days before RP's twenty-first birthday, the OMRDD found that RP did not qualify for benefits from OMRDD. Nevertheless, the OMRDD agreed to pay for RP to remain at the JRC past her twenty-first birthday, pending an appeal of this finding.

On September 9, 2008, while the administrative appeal was pending, a Transmittal was sent to the New York State Office of Mental Health (OMH) indicating that RP was in need of

3

adult services and a residential placement.  JRC was then advised by OMH that no housing was

available and that it would be notified of future openings.

On October 21, 2008, an administrative hearing was held at the Defendants' offices to

reconsider OMRDD's denial of RP's eligibility to receive services.  At that time, RP's clinician

and case manager from JRC testified that RP did in fact meet all of OMRDD's eligibility

requirements.

Nevertheless, on December 5, 2008, a designee of the New York Department of Health

Commissioner confirmed that RP was not eligible for OMRDD services.  See MHL § 13(f)

("Nothing in this section shall be construed to create an entitlement to adult services.").  In

connection with this finding, OMRDD ceased to pay for RP's stay at the JRC.  Shortly

thereafter, on January 12, 2009, the OMRDD expressly disclaimed responsibility to provide

services for RP, and on January 14, 2009, the Suffolk County DSS did the same.  When

employees of the JRC requested direction from the Suffolk County DSS as to where RP should

be placed, the Suffolk County DSS directed that RP be taken to a Suffolk County homeless

shelter.  They advised that it was the Agency's standard procedure because RP was past the age

of twenty-one and no longer DSS's responsibility.  However, feeling that "it would be

unconscionable to leave RP in a homeless shelter without a plan, without housing, and without

adequate supervision," (2d Am. Compl., ¶ 37), the JRC staff continued to house RP at the

Center, despite the fact that no public agency was paying for her tuition.  JRC acknowledges that

the New York State Department of Health Commissioner's office was unwilling to take

responsibility for her or make any efforts to provide RP with any further assistance.

At the time of these events, RP did not have any identified family or community ties, and

the director of the JRC believed that she was not capable of representing herself in any further

appeal proceedings.  The JRC's director therefore petitioned the Suffolk County Supreme Court to appoint a guardian for RP, and on April 13, 2009, a Judge in the Suffolk County Model Guardianship Part granted this petition.  RP's new guardian then arranged for her to be placed in a "community residence" in Suffolk County, and RP was released to that residence on December 15, 2009.

Neither the Suffolk County DSS nor New York State paid for RP's stay at the JRC from December 5, 2008 through December 15, 2009.  Therefore, on December 15, 2009, the day RP was released to a community residence, the JRC sent a statement to the Suffolk County DSS and to Suffolk County detailing $245,787 in unpaid tuition charges for RP.  On March 12, 2010, the JRC also served Suffolk County with a notice of claim for this charge, and on April 29, 2010, it sent a similar demand letter to the Suffolk County DSS.  Neither Suffolk County nor the Suffolk County DSS paid the invoice sent by the JRC.

On August 9, 2010, the JRC commenced this action against the Suffolk County DSS, as well as the New York State Office of Mental Health.  The Plaintiff ultimately amended its complaint twice, withdrawing its claims against the New York State Office of Mental Health and alleging new claims against Suffolk County.  Presently, the Plaintiff asserts four quasi-contract causes of action against both of the Defendants: (1) breach of implied contract, (2) unjust enrichment, (3) restitution, and (4) quantum meruit.  The Plaintiff's basic theory underlying all of these claims is that the Suffolk County DSS and Suffolk County either implicitly agreed — or in fairness should have agreed — to pay for RP's care at the JRC.

The Defendants now move for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) ("Rule 12(c)").  They argue that the JRC has failed to allege: (1) that the Defendants were legally responsible for RP's care at JRC during the period of December 5,

2008, to December 15, 2009; (2) that the Defendants agreed to be responsible, either implicitly

or explicitly, for RP's care at JRC during the period of December 5, 2008, to December 15,

2009; or (3) that JRC submitted demands, bills, invoices or statements to the Defendants during

the period of December 5, 2008 to December 15, 2009, regarding charges for RP's care at JRC

within that period.  For the reasons set forth below, the Court finds that the Plaintiff has

adequately alleged that the Defendants had a duty to RP, and thus the Defendants' motion for

judgment on the pleadings is denied.

## II. DISCUSSION

### A. As to the Legal Standard for Judgment on the Pleadings

In general, "the standard for addressing a Rule 12(c) motion for judgment on the

pleadings is the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim."

Cleveland v. Caplaw Enters., 448 F.3d 518, 521 (2d Cir. 2006).

Under the now well-established Twombly standard, a complaint should be dismissed only

if it does not contain enough allegations of fact to state a claim for relief that is "plausible on its

face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929, 570, 550

U.S. 544, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007).  The Second Circuit has explained

that, after Twombly, the Court's inquiry under Rule 12(b)(6) is guided by two principles.  Harris

v. Mills, 572 F.3d 66 (2d Cir. 2009) (citing Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937,

1949, 173 L. Ed. 2d 868 (2009)).

"First, although 'a court must accept as true all of the allegations contained in a

complaint,' that 'tenet' 'is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the

elements of a cause of action, supported by mere conclusory statements, do not suffice.'"  Id. at

72 (quoting Iqbal, 129 S. Ct. at 1949). " 'Second, only a complaint that states a plausible claim

for relief survives a motion to dismiss' and '[d]etermining whether a complaint states a plausible

6

claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" Id. (quoting Iqbal, 129 S. Ct. at 1950). Thus, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and . . . determine whether they plausibly give rise to an entitlement of relief." Iqbal, 129 S. Ct. at 1950.

In considering a motion to dismiss, this Court accepts as true the factual allegations set forth in the complaint and draws all reasonable inferences in the Plaintiffs' favor. Zinermon v. Burch, 494 U.S. 113, 118, 110 S. Ct. 975, 979, 108 L. Ed. 2d 100 (1990); In re NYSE Specialists Secs. Litig., 503 F.3d 89, 91 (2d Cir. 2007). Only if this Court is satisfied that "the complaint cannot state any set of facts that would entitle the plaintiff to relief" will it grant dismissal pursuant to Rule 12(b)(6). Hertz Corp. v. City of N.Y., 1 F.3d 121, 125 (2d Cir. 1993). The issue on a motion to dismiss is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Todd v. Exxon Corp., 275 F.3d 191, 198 (2d Cir. 2001) (quoting Scheuer v. Rhodes, 416 U. S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)).

## B. As to the Plaintiff's Legal Theory

The Plaintiff is seeking recovery under the doctrine of restitution, which is a form of equitable relief. There are various rubrics under which one can recover restitution for benefits it voluntarily conferred, including quasi-contract, unjust enrichment, and quantum meruit. These rubrics are not necessary mutually exclusive and often blend together. See Cooper v. Salomon Bros. Inc., 1 F.3d 82, 86 (2d Cir. 1993) ("Although the complaint itself fails to specify the basis for relief, the court interpreted his complaint as seeking restitution damages for unjust enrichment under a theory of quasi-contract, in essence a claim for quantum meruit."). "Because the term 'restitution' entered the legal lexicon relatively recently, its use is often a source of

confusion among courts and commentators." F.T.C. v. Bronson Ptnrs., LLC, 654 F.3d 359, 370 (2d Cir. 2011).

Here, the Plaintiff does not clearly articulate any one theory for recovery, but conflates several equitable doctrines. This is understandable, as several courts have found that quantum meruit, unjust enrichment, and restitution claims "[a]re not separate causes of action under New York law, but are instead conceptualized as different facets of a single quasi contract cause of action and should be treated as such." DeSilva v. North Shore-Long Island Jewish Health Sys., Inc., No. 10 Civ. 1341, 2012 WL 748760, at *9 n.12 (E.D.N.Y. March 7, 2012). See, e.g., Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 175 (2d Cir. 2005) (analyzing "quantum meruit and unjust enrichment together as a single quasi contract claim," because quantum meruit simply describes "one measure of liability for the breach" of a quasi-contract); Newman & Schwartz v. Asplundh Tree Expert Co., Inc., 102 F.3d 660, 663 (2d Cir. 1996) ("Counts One and Three for quantum meruit and unjust enrichment were quite properly subsumed by the district court into a single count for restitution").

The Court agrees that in the instant case, the Plaintiff essentially asserts one cause of action for quasi-contract seeking restitution. Thus, the Court will address the merits of the Plaintiff's four causes of action simultaneously as one claim, grounded on breach of implied contract; unjust enrichment; restitution; and quantum meruit.

## C. As to the Law of Quasi-Contract

Under New York law, which both parties agree governs, there are two classes of implied contracts: those implied in fact — which is not applicable here — and those created in law. The latter are known as quasi or constructive contracts, which are unrelated to the intentions of the parties. Goldman v. Metro. Life Ins. Co., 5 N.Y.3d 561, 807 N.Y.S.2d 583, 841 N.E.2d 742

(2005).  An implied-in-law contract is thus not a contract all, but rather an obligation which the law creates from the circumstances present based upon equitable principles which serve to operate whenever justice requires that compensation be made.  See United States v. P/B STCO 213, ON 527 979 ("P/B STCO"), 756 F.2d 364, 370 n.7 (5th Cir. 1985) ("We use the term 'quasi-contract' rather than 'contract implied in law' because the clear weight of scholarship suggests the former is more precise, reflecting the absence of promise that distinguishes so-called contracts implied in law from true contracts in which the parties' mutual promise is express or implied in fact."); Super v. Abdelazim, 139 A.D.2d 863, 527 N.Y.S.2d 591 (3d Dep't 1988) (finding a contract to be implied at law to prevent unjust enrichment of one party and to render as much as is deserved to the other party in the interest of equity).

Professors Keener, Corbin, and Williston succinctly stated the non-consensual, policy-grounded basis of quasi-contract as follows:

> Quasi-contract "is a term used to cover a class of obligations where the law, though the defendant did not intend to assume an obligation, imposes an obligation upon him, notwithstanding the absence of intention on his part, and in many cases in spite of his actual dissent."  W.A. Keener, The Law of Quasi-Contracts, at 5 (1893).  "Quasi contractual obligations are imposed by the law for the purpose of bringing about justice without reference to the intention of the parties."  1 Williston on Contracts § 3A, at 14 (3d ed., 1957).  "A quasi contractual obligation is one that is created by the law for reasons of justice, without any expression of assent and sometimes even against a clear expression of dissent."  1 Corbin on Contracts § 19, at 46 (1963).  Professor Corbin tartly noted that "[t]he term quasi is introduced as a weasel word, that sucks all the meaning of the word that follows it," id. at 45-46; nevertheless, the phrase quasi-contract endures as a label for actions in which recovery is based on the theory of a non-consensual promise imposed for policy reasons of equity and justice.  See Corbin, Quasi-Contractual Obligations, 21 Yale L.J. 533, 544 & 545 n.63 (1912).

P/B/ STCO, 756 F.2d at 370.  What defines an implied contract at law is a duty, because it is clear that no promise or agreement was ever made or intended.  Bradkin v. Leverton, 26 N.Y.2d

9

192, 309 N.Y.S.2d 192, 257 N.E.2d 643 (1970); <u>Reisner v. Recco Temp. Servs., Inc.</u>, 136

A.D.2d 686, 524 N.Y.S.2d 102 (2d Dep't 1988).

**D. <u>As to the Plaintiff's Claims</u>**

The Plaintiff claims that a contract was implied in law as a quasi-contractual obligation to

"do justice even though it is clear that there has been no agreement or expression of assent by

word or act." (Pl.'s Opp. at 9.)  According to the Plaintiff, there exists a class of cases where it is

imperative that a duty be performed swiftly and efficiently for the protection of the public or an

innocent third party, "in which a 'Good Samaritan' who voluntarily intervenes to perform a duty

may receive restitution for his services". (Pl.'s Opp. at 11.)  The Plaintiff relies on the idea that

it "has become crystallized in the doctrine that performance of another's duty to a third person, if

rendered by one qualified to provide such services with intent to charge for them is grounds for

recovery in quasi-contract." <u>The Peninsular & Oriental Steam Navigation Co. v Overseas Oil</u>

<u>Carrier, Inc.</u>, 553 F.2d 830, 835 (2d Cir. 1977).

Although the Plaintiff relies heavily on cases arising in the tort context, the Plaintiff's

claims solely arise under the doctrine of restitution.  As articulated by the Restatement (Third) of

Restitution and Unjust Enrichment, restitution is "readily justified when the claimant's

unrequested intervention takes the form of providing or supplying what may loosely be called

"emergency benefits."  Restatement (Third) of Restitution § 3 int. nt. (2011) ("Rest. 3d. Resti.").

There are several theories under which a plaintiff can recover restitution.  The common thread

between all of these concepts is "a manifest public interest that the transaction in question take

place, and a judgment that appropriate intervention (by the claimant, if need be) ought not be

deterred or delayed by requiring prior agreement as a condition of recovery." <u>Id.</u>

Generally, a plaintiff may recover restitution because it performed a duty of the defendant, articulated as follows:

> (1) A person who performs another's duty to a third person or to the public is entitled to restitution from the other as necessary to prevent unjust enrichment, if the circumstances justify the decision to intervene without request.
>
> (2) Unrequested intervention may be justified in the following circumstances:
>
> . . .
>
> > (b) the claimant may be justified in performing another's duty to furnish necessaries to a third person, to avoid imminent harm to the interests of the third person; and
> >
> > (c) the claimant may be justified in performing another's duty to the public, if performance is urgently required for the protection of public health, safety, or general welfare.

Id. Thus, the Plaintiff's claims may be based on one of these three theories of liability: (1) that the JRC intervened and took care of the Defendants' duty to provide necessaries to RP; (2) that the JRC intervened and took care of the Defendants' duty to RP to protect her from harming herself; or (3) that the JRC intervened and took care of the Defendants' duty to the public's health, safety, or general welfare by protecting the public from RP.

According to the Restatement, the claimant must establish the following three elements: (1) a degree of urgency; (2) some obstacle to a prior agreement; and (3) performance of another's duty without request when the claimant is a proper party to intervene. There is no question that the Plaintiff has adequately alleged a degree of urgency, some obstacle to prior agreement, and that it was the proper party to intervene. There was an emergency situation in that RP was to be left at the homeless shelter with no other options for residency available. There was certainly an obstacle to prior agreement as the Defendants not only expressly disclaimed any responsibility for RP, but in fact expressly directed that she be taken to the homeless shelter. Finally, at least for purposes of a motion to dismiss, it seems plausible that JRC was the appropriate party to

11

intervene, as it was the institutional facility that RP was housed in prior to and after turning twenty-one years of age.

It appears that the major obstacle to the Plaintiff's ability to state a claim for relief pursuant to the doctrine of restitution is whether it performed what could properly be characterized as the Defendants' duty in the first instance.  In other words, the issue is whether, taking all of the Plaintiff's allegations as true, the Defendants had a duty to RP and/or to the public under the particular circumstances of this case as set forth in the Second Amended Complaint.  The Court will first analyze each of the three potential theories of recovery and then address whether the Plaintiff has adequately alleged the necessary predicate duty.

### 1. Necessaries

As described above, under one line of authority, "[a] person who has performed the noncontractual duty of another by supplying a third person with necessaries which in violation of such duty the other had failed to supply, although acting without the other's knowledge or consent, is entitled to restitution therefor from the other if he acted unofficiously and with intent to charge therefor."  Rest. 3d. Resti. § 113.  Necessaries generally refer to essentials, such as food, clothing, housing and medical care.  However, this theory is only applicable where there is an underlying duty of the defendant to supply goods or services to a third party, either under common law or statute.  For example, traditionally this category included the common-law duty of support owed by one spouse to another, or by a parent to a child; duties imposed on public bodies to care for prisoners or others in custody; and the obligation of maintenance and cure owed in admiralty by the ship owner to the injured seaman.  Thus, it is a necessary prerequisite that there be the existence of a legal duty to make the underlying act a "necessary."

One of the two cases relied upon the Plaintiff falls into this category of restitution.  In Greenspan v. Slate, 97 A.2d 390, 12 N.J. 426 (1953), the 17-year-old daughter of the defendants injured her foot, but her parents declined to provide her with medical aid.  An intervenor who discovered her plight took her to the office of the plaintiff physician for medical care, deemed by the court to be a necessary.  Id. at 429 ("The testimony of Dr. Greenspan that permanent injury would have ensued if there had not been proper medical care and attention at the time is uncontradicted.").  Dr. Greenspan rendered a bill to the parents after the treatment, which they refused to pay.  The New Jersey Supreme Court confirmed that "[t]he defendants were under an obligation as part of their duty to support and educate their daughter, to provide her with medical services both under normal circumstances and in emergencies."  Id. at 443.  In addition, the court relied upon several New Jersey statutory provisions that supported this requisite duty of the defendants.  For example, the court took note of a criminal statute in which a father who refuses to provide for his minor children is guilty of a misdemeanor.  Id. at 438.  Based upon this premise, the court found that "[a]ll the necessary elements are present to impose on the defendants the legal obligation to pay for medical expenses rendered to their child in an emergency."  Id. at 443.

Here, the Plaintiff makes no allegations under this rubric and in any event, this legal theory is inapplicable to the instant case.  The Plaintiff has not alleged that the Defendants had a predicate duty to RP to provide her with food or shelter after the age of twenty-one.  Cases such as Greenspan that have found such a duty, almost exclusively focus on the typical situation where a husband or parent improperly fails to provide support for a wife or minor child.  See also In re Weber's Estate, 239 N.W. 260, 256 Mich. 61 (1931) (finding that the plaintiff was entitled to recover from the estate of a mentally incompetent person for necessaries furnished).  The

Plaintiff has pointed to no such duty in the Second Amended Complaint, either statutory or in common law.  In fact, the statutory law pointed to by the Plaintiff explicitly provides such a duty to minors only.  Thus, the Court sees no basis for the finding of such a duty in this case and any cause of action for restitution premised on the provision of necessaries must be dismissed.

### 2. Avoiding Imminent Harm

In addition to a theory of restitution based on the provision of necessaries, "[t]here is also a well-developed parallel to this type of case involving private parties seeking restitution for fulfilling a defendant's . . . moral obligation to a particular person.  These private parties have succeeded in quasi-contract actions where the public has an important interest in the performance of the duty or moral obligation."  P/B/ STCO, 756 F.2d at 373 n.12; see Wade, Restitution for Benefits Conferred Without Request, 19 Vand. L. Rev. 1183, 1185, 1195-98 & nn. 58-80 (1966); Restatement of Restitution §§ 112–14 (1937); G.E. Palmer, II The Law of Restitution § 10.4(a), at 377-83 (1978).  This theory of recovery, which appears to form the core of the Plaintiff's allegations, is sometimes known as the "emergency assistance" doctrine.  It arises when one performs the duty of another by providing goods or services to a third person, although acting without the other's knowledge or consent, if (a) he acted unofficiously and with intent to charge therefor, and (b) the things or services supplied were immediately necessary to prevent serious bodily harm to or suffering by such person.  Rest. 3d. Resti. § 114.  Notably, the vast majority, if not all of the cases to have applied this doctrine, have been in cases of urgent medical care.

To the extent the Plaintiff's theory of recovery is premised on this strand of restitution law, the Plaintiff supports its position with the Second Circuit case Peninsular & Oriental Steam Navigation Co. v. Overseas Oil Carriers, Inc., 553 F.2d 830 (2d Cir. 1977).  In Peninsular, the question presented was whether the owner of a vessel that alters course to come to the aid of a

stricken seaman aboard a ship without medical staff, may recover additional fuel costs caused by

the diversion.  In short, when the fireman on the S.T. OVERSEAS PROGRESS suffered a heart

attack on board, another ship, the CANBERRA, changed course and increased her speed in order

to provide the necessary medical care.  While the owner of the S.T. OVERSEAS PROGRESS

promptly paid for the medical expenses, it refused to pay for the additional fuel consumed by the

liner as a result of the extra distance traveled and the increased speed, claiming that it would be

contrary to the "traditional concept of rescue at sea."  Id. at 833.  In Peninsular, the court ruled

that application of equitable principles required reimbursement of such additional fuel expenses.

However, this case is distinguishable in a significant manner.  In Peninsular, the S.T.

OVERSEAS PROGRESS was "obligated to make reasonable efforts to provide him with swift

medical care" under an "admiralty doctrine [that] has been described as a preindustrial analogue

to modern 'workman's compensation' statutes."  Id. at 834; see The Bouker No. 2, 241 F. 831

(2d Cir.), cert. den., 245 U.S. 647, 38 S. Ct. 9, 62 L. Ed. 529 (1917), 2 Norris, The Law of

Seamen s 542-544 (1970).  In other words, the Second Circuit's determination was based on the

fact that the vessel was obligated under the law, not merely because of ideas of decency, to

provide medical aid to its crew member, and thus the CANBERRA's assistance saved it

considerable costs that it would have otherwise expended.  See id. ("Through her expeditious

intervention, the CANBERRA performed the OVERSEAS PROGRESS's duty to Turpin, far

more swiftly and more efficiently than it could have been carried out by the OVERSEAS

PROGRESS.  In such circumstances, the principles of "quasi-contract" require recovery.").

In Peninsular, Chief Judge Kaufman did note that:

> Although the law ordinarily frowns on the claims of a "mere volunteer", there is
> a class of cases where it is imperative that a duty be performed swiftly and
> efficiently for the protection of the public or an innocent third party, in which a
> "good Samaritan" who voluntarily intervenes to perform the duty may receive

15

restitution for his services.  This rule has become crystallized in the doctrine that performance of another's duty to a third person, if rendered by one qualified to provide such services with intent to charge for them, is a ground for recovery in quasi-contract.  This principle is limited to cases where the services are immediately necessary to prevent injury or suffering.  <u>Greenspan v. Slate</u>, 12 N.J 426, 97 A.2d 390, 397 (1953) (Vanderbilt, C.J.); Restatement of Restitution s 114. <u>Cf. Wyandotte Trans. Co. v. United States</u>, 389 U.S. 191, 204, 88 S. Ct. 379, 19 L. Ed. 2d 407 (1967).

<u>Id.</u> at 834–35.  This Court recognizes the validity of this legal theory.  Nevertheless, the operative phrase in the above recitation of the applicable doctrine is "performance of *another's duty* to a third person."  <u>See id.</u> at 835 ("The circumstances of this case compel application of the rule.  The OVERSEAS PROGRESS had a manifest duty to provide Turpin with speedy medical attention.  Her Captain, in the exercise of his reasonable discretion, asked the CANBERRA to perform that duty in her stead."); <u>see also</u> <u>U.S. v. P/B STCO 213, ON 527 979</u>, 756 F.2d 364, 369 (5th Cir. 1985) (applying quasi-contract principles to the United States' action for recovery of pollution cleanup costs because "[t]he FWPCA imposes on polluters the duty to clean up the waters they have polluted.  33 U.S.C. § 1321(c)(1)."); <u>id.</u> at 371 ("Courts consistently have recognized these principles and have imposed on defendants a quasi-contractual obligation to reimburse a plaintiff, who has performed a duty, at his own expense, *where the defendant was primarily obligated to discharge the duty*.") (emphasis added).

Here, the Plaintiff alleges that RP "would have acted out and harmed herself . . . if left unsupervised given her history of self-injurious and aggressive tendencies."  (Pl.'s Opp. at 13.)  Thus, for the Plaintiff to recover under this theory, it would necessarily need to plead and eventually demonstrate that the County had a duty to protect RP from harming herself.  Later in this decision the Court will explore whether there is such a duty.

### 3. Public Health, Safety or General Welfare

Under the final potential theory of recovery, one may be entitled to restitution where a person has performed the duty of another by supplying things or services, not because they were immediately necessary to prevent serious bodily harm to or suffering by such person, but rather because it was immediately necessary to further the interests of public decency, health, or safety. This articulation of the restitution doctrine is also categorized as the "emergency assistance doctrine" under New York law.  See Chase Manhattan Bank, N.A. v. T&N plc, No. 87 Civ. 4436, 1996 WL 603934, at *8 (S.D.N.Y. Oct. 22, 1996) ("Under New York law, a claim of restitution is governed by the 'emergency assistance doctrine' derived from § 115 of the Restatement (First) of Restitution").  Historically, this rule has had various applications, including burial of the dead and removing an obstruction from or making repairs upon a public road, which had become imminently dangerous to members of the traveling public.  "Cases applying [this theory] illustrate that the nature of the danger must be acute and severe, not merely serious or problematic."  Id.

In the Second Amended Complaint, the Plaintiff alleges that it its actions were necessary to protect not only RP, but the safety of the public who would be coming in contact with her, particularly those unaware of RP's disabilities and impulsiveness which at times manifest as aggression and assaultive behavior.  (2d Am. Compl., ¶ 63.)

However, once again, the Defendants must have failed to comply with their own legal duty, imposed in the interests of public health and welfare.  See Rest. 3d Resti. § 22 cmt. h ("As with any claim under § 22, a recovery under subsection (2)(c) is restricted to expenditures that discharge a duty of the defendant as opposed to a duty of someone else."); id. ("If *the defendant's duty*, the existence of an emergency, the benefits of the claimant's intervention, and

the impossibility of action by the defendant are all clear, the claimant's entitlement to restitution is clear as well.") (emphasis added); id., cmt. i ("Even if the claimant's intervention is justified in every respect, there can be no unjust enrichment of the defendant/obligor — and therefore no claim in restitution — unless such intervention relieves the defendant of a liability to which the defendant would otherwise have been subject."); United States v. Consolidated Edison Co., 580 F.2d 1122, 1127 (2d Cir. 1978) (The basis for recovery in this case is that the [United States] performed Con Edison's duty to acquire and maintain adequate supplies of electrical power under emergency conditions with the clear intent that it be reimbursed for its costs."); In re G-I Holdings, Inc., 443 B.R. 645, 671 (Bankr. D.N.J. 2010) ("In other words, to maintain a claim for restitution in this case [under New York law], the Housing Authority need not prove that it provided Debtors with notice of its intent to charge for the abatement work, but it must establish that it had an underlying duty to tenants to perform this work (as opposed to if the abatement work performed was insignificant or voluntarily performed for altruistic reasons)."); see also Bd. of Educ. v. A, C & S, Inc., 131 Ill.2d 428, 546 N.E.2d 580 (1989) ("the proper interpretation of [Restatement of Restitution § 115 (1937)] is that the defendant must have a duty in the first instance. . . . A section 115 cause of action does not result merely because the defendants' product may be hazardous or damage the plaintiffs' buildings . . . . There must be an independent basis which establishes a duty upon the defendant to act and the defendant must have failed to abide by that duty.").

The duty element is a "'flexible concept' that can be met by the 'manifest responsibilities' of a party in a given 'factual context' as well as by common law or statutory mandates." Hebron Pub. Sch. Dist. No. 13 of Morton Cnty., State of N.D. v. U.S. Gypsum, 690 F. Supp. 866, 869 (D.N.D. 1988) (citing United States v. Consolidated Edison Co. of N.Y., 580

18

F.2d 1122, 1127 (2d Cir. 1978)).  Thus, in <u>Consolidated Edison Co. of New York</u>, the Second

Circuit found that the company had a "general responsibility" to provide its customers with

electricity, even though Consolidated Edison would only be liable to its customers in the event of

intentionally wrongful or grossly negligent cutoffs.  The Second Circuit explained that under the

emergency assistance doctrine, something less than an absolute duty will qualify.  <u>See</u> 580 F.2d

at 1128 ("Similarly, Con Edison had, if not an absolute, at least a manifest, duty to provide its

customers with electricity.").  However, the <u>Consolidate Edison</u> court still necessarily premised

this finding upon some sort of duty, albeit one not found directly in a statute or regulation.  In

particular, the court stated that "based on the testimony of Con Edison's own officials, Con

Edison has a general responsibility to provide electricity, one founded in its monopoly and the

public service nature of its business."  <u>Id.</u>; <u>see Cayuga Power Corp. v. Pub. Serv. Comm'n</u>, 226

N.Y. 527, 532, 124 N.E. 105, 106 (1919) (Cardozo, J.) (emphasizing that "(t)he duty to serve the

public goes hand in hand with the privilege of exercising a special franchise . . . .").  Moreover,

the Court did base this finding at least partly on the statutory law of New York, in which Con

Edison had a duty to "furnish and provide such service, instrumentalities and facilities as shall be

safe and adequate and in all respects just and reasonable. . . ." N.Y. Pub. Serv. Law § 65(1)

(McKinney 1955).

   In <u>City of St. Louis v. Am. Tobacco Co. Inc.</u>, 70 F. Supp. 2d 1008 (E.D. Mo. 1999), the

plaintiff alleged that the defendant company had a duty to "bear the cost of tobacco related

diseases" and were required to discharge their public benefit functions.  The court found that this

pleading was sufficient to survive a motion to dismiss.  <u>Id.</u> at 1017.  However, in <u>City of St.</u>

<u>Louis</u>, the plaintiff could clearly articulate the defendant's wrongful conduct as including, but

not limited to, the manufacture, advertising, sale and promotion of tobacco products in the state

of Missouri.  With regard to the "duty" element of Section 115, although it "need not be absolute, and need not be of a type or degree that would otherwise give rise to legal liability", Hebron Pub. Sch., 690 F. Supp. at 869 (citing United States v. Consolidated Edison Co. of N.Y., 580 F.2d 1122, 1127 (2d Cir. 1978)), it must nevertheless have some basis.

Therefore, under either potential theory of recovery for restitution — avoiding imminent harm or the interests of public health and safety — it is necessary for the Plaintiff to plead that there was a duty imposed on the Defendants to protect the public from serious injury or bodily harm caused by RP.  The Court will address this issue below.

**E. As to Whether There is the Necessary Predicate Duty Owed by the Defendants**

The Plaintiff essentially contends that the Defendants breached a duty of care that it allegedly owed to RP to provide her with a safe and appropriate placement after she turned twenty-one years old, and thus created an emergency situation that placed JRC in a position where it had to act immediately to prevent RP from being harmed or harming others.

**1.   As to a Statutory Duty**

First, the Plaintiff points to the New York statutory scheme for a disabled minor's transition when he or she reaches twenty-one years of age, to imply a continuing duty on the part of the County and the DSS to care for or otherwise provide for the individual.  In particular, the Social Services Law and the Mental Health Law describe a number of mandated steps that must be taken in order to provide for the smooth transition to adulthood and *possible* continuing placement for government provided social services.  (See Pl.'s Opp. at 11 ("In essence, the law requires the Commissioner to alert the various state agencies when students with disabilities that have been placed in out of state residential facilities will be attaining the age of twenty-one and will require in state services.").)

Social Services Law § 398 requires the social services official, such as the Commissioner, to submit a report on the child's needs for services after she reaches the age of twenty-one in anticipation of her return to New York, if the Commissioner determines that the child will need services as an adult.  Specifically, it states:

> 13. (a) In the case of a child with a handicapping condition who is placed, pursuant to this chapter, in a foster care agency or institution located outside the state, and who attains the age of eighteen, the social services official shall:
>
> (i) determine whether such child will need services after the age of twenty-one, and, if such need exists;
>
> (ii) assess the nature of the services required;
>
> (iii) notify the parent or guardian of such child's need for services; and
>
> (iv) upon the written consent of the parent or guardian, . . . submit a report on the child's need for services after age twenty-one to the department for planning purposes.
>
> (b) Upon the written consent of the parent or guardian, the department shall submit the report received pursuant to paragraph (a) of this subdivision to the council on children and families.
>
> (c) When a child's report is submitted to the council on children and families pursuant to this subdivision, the council shall cooperate with adult service providers, such as the department of social services, the office of mental retardation and developmental disabilities, the office of mental health and the office of vocational rehabilitation of the education department in planning and coordinating such child's return to New York state for adult services.  The council shall arrange with the appropriate state agency for the development of a recommendation of all appropriate in-state programs operated, licensed, certified or authorized by such agency and which may be available when such child attains the age of twenty-one. . . .

N.Y. Soc. Servs. Law § 398 (13).  The purpose of completing a "Transmittal" — i.e., completing an assessment and written report and then sending it to the Council of on Children and Families, who then cooperates with other agencies such as the Office of Mental Retardation and Development Disabilities ("OMRDD") — is to evaluate and identify the returning individual's anticipated needs for adult services and residential placements.  The Court agrees with the

Plaintiff that the clear intent of these provisions is to garner all possible relevant information to assist in securing an appropriate placement for an individual such as RP, if such placement is warranted.  However, whether the official must assess the nature of the services required and submit a report setting forth the child's needs for services after age twenty-one, depends upon whether the official initially determines that the child will need services as an adult.

In this case, the Complaint alleges that "[t]he Commissioner of SCDSS was required to prepare a Transmittal for RP in compliance with Social Services Law § 398 in anticipation of RP attaining the age of twenty-one."  (2d Am. Compl. at 14.)  However, there is no allegation that the Commissioner determined that RP was in need of services and consequently whether or not he proceeded with the steps outlined in Social Services Law § 398 13(a)(ii)-(iv).  In fact, the Complaint alleges that "[o]n information and belief, SCDSS again did not request assistance from the Council on Children and Families."  Thus, the Plaintiff's allegation appears to be that the Commissioner either (1) wrongly determined that RP was not in need of adult services; or (2) determined that RP was in need of adult services but did not follow with the steps outlined in Social Services Law § 398 13(a)(ii)-(iv) — namely, to send a Transmittal to the Council on Children and Families.

Instead, the Complaint states that "[o]n or about December 7, 2007, JRC *along with SCDSS as RP's guardian*, submitted a Transmittal, pursuant to Social Services Law § 398 to begin evaluation for transition from child to adult services to the Long Island Developmental Disabilities Services Office (LIDDSO), the regional OMRDD office."  (2d Am. Compl. at 19.)  Thus, the Defendants did participate in sending a Transmittal, but it was apparently not to the correct authority under the statute.  LIDDSO determined that RP was not eligible to receive adult services under programs administered by OMRDD.  This was administratively appealed to

22

OMRDD to no avail.  On September 8, 2008, a Transmittal was also sent to OMH.  However, OMH advised that no housing was available.

It is not entirely clear based upon the briefing submitted to the Court whether the Commissioner failed to make a determination as to RP's entitlement to adult services in the first instance, or whether he did make a determination but simply based it upon the denial of the OMRDD.  If it is the latter, and assuming the Commissioner can properly rely upon OMRDD's denial, then the Commissioner satisfied his duties as set out in the Social Services Law and there is no duty upon which to base any theory of restitution.  The OMRDD found that the clinical evaluations did not provide evidence that RP had a qualifying diagnosis that met with the agency's statutory criteria.  Despite the Plaintiff's allegation that this is an "all too common ploy used by OMRDD to reject dually diagnosed individuals", this conjecture alone would not be sufficient to create a duty to RP so as to state a claim for restitution.

Moreover, an administrative appeal took place to challenge the determination to deny RP services as an adult in need of transition from the care and custody of the Defendants to the OMRDD.  The Court notes that the OMRDD paid the Plaintiff for the services it was providing RP pending the outcome of the appeal.  However, the New York State Department of Health's Commissioner Designee rendered his decision denying RP Medicaid eligibility to receive residential placements and treatment services through OMRDD.  Again, the Plaintiff may take issue with the merits of that decision and whether some government entity should have continued to take responsibility for RP.  However, disagreement with that determination cannot create a duty on the part of the current Defendants to RP so as to produce a right to restitutionary recovery.

Notably, if the Commissioner properly determined that adult services were not warranted to RP, the Plaintiff cannot point to a single statutory provision set forth in either the Second Amended Complaint or in the Plaintiff's opposition that states that the County or the DSS has a duty to an individual once they turn twenty-one, even if there was a previous duty owed when he or she was a minor.  Cf. Palmer, supra, at 381 ("Quasi-contractual liability for emergency medical care has arisen frequently in actions against a public agency which is under a *statutory duty* to provide medical care for indigent persons or others who are entitled to public assistance.") (emphasis added).  See, e.g., Fahey v. United States, 153 F. Supp. 878, 884 (2d Cir. 1957) ("Merely because a veteran once served in the United States Armed Forces does not mean that the United States assumed the duty to protect the general public from those veterans who might become dangerous to society.").

However, if the Commissioner failed to make a determination as to RP's entitlement to adult services in the first instance, and thus the Commissioner breached its duty to send a Transmittal to the Council and subsequently caused the emergency situation alleged in the Complaint, then there is a conceivable statutory basis for a duty for restitutionary recovery.  Cf. Saratago Hosp. v. Ryan, 126 Misc.2d 351, 353, 482 N.Y.S.2d 701 (Sup. Ct. Saratoga Cnty. 1984) (discussing whether a hospital caring for a patient rather than retain him in an allegedly inappropriate facility or release him with no treatment at all, could force the Social Services Department to take action and find more appropriate care for the patient).  Because the Court cannot determine now what the Plaintiff can ultimately demonstrate, and accepting the Plaintiff's allegations as true and viewing the facts in a light most favorable to the Plaintiff, the Court finds that there is a potential basis for a statutory duty of the Defendants to RP to assist with her transition to receive services as an adult.  In other words, if the reason RP was not provided with

24

services was because of a breach of the duty on the part of the Defendants to actively secure such a placement, then JRC may be entitled to restitution in this case.  Thus, on this very narrow ground, the Court finds that the Plaintiff has stated a claim for restitution.

### 2.  Moral Obligation

Other than the Plaintiff's attempts to rely on New York's statutory scheme to allege a predicate duty, in its opposition the Plaintiff cites vaguely to the "heightened sense of responsibility" the Defendants should have had because RP was under the "care and custody" of DSS since she was nine years old.  Certainly, one could argue that there may be a moral obligation for the DSS to care for RP into adulthood.  "Courts resolve legal duty questions by resort to common questions of morality, logic and considerations of the social consequences of imposing the duty."  Tenuto v Lederle Labs., Div. of Am. Cyanamid Co., 90 N.Y.2d 606, 612, 665 N.Y.S.2d 17 (1997).  Nevertheless, this Court cannot rely solely upon vague notions of morality to lead to a possible recovery of restitution in the particular circumstances of this case. See Palmer, supra, at 379 n.17 ("There is dictum . . . that a father's *moral* obligation to support his child is a sufficient basis for restitution, but most courts have assumed that there must be a legal obligation.").  If this was a sufficient basis to state a claim, it would open the door to allow any claim for restitution from the government whenever the government has previously provided social services to an individual and arguably those services should be continued, even if the result of an administrative procedure dictates otherwise.  Thus, any attempted cause of action for restitution premised only on a moral duty of the Defendants, is denied.

### 3.  Parens Patriae

The Plaintiff also raises the doctrine of *parens patriae* to allude to a duty on the part of the Defendants.  *Parens patriae* is defined as either the state in its capacity as provider of

protection to those unable to care for themselves; or, a doctrine by which a government has standing to prosecute a lawsuit on behalf of a citizen.  Black's Law Dictionary (9th ed. 2009). The Court recognizes that "the state has a legitimate interest under its *parens patriae* powers in providing care to its citizens who are unable . . . to care for themselves," as well as "authority under its police power to protect the community" from any dangerous mentally disabled persons. Addington v. Texas, 441 U.S. 418, 426, 99 S. Ct. 1804, 1809, 60 L. Ed. 2d 323 (1979); see also Heller v. Doe by Doe, 509 U.S. 312, 113 S. Ct. 2637, 125 L. Ed. 2d 257 (1993).  States are vested with the historic *parens patriae* power, including the duty to protect "persons under legal disabilities to act for themselves."  Hawaii v. Standard Oil Co., 405 U.S. 251, 257, 92 S. Ct. 885, 888, 31 L. Ed. 2d 184 (1972); see O'Connor v. Donaldson, 422 U.S. 563 ,583, 95 S. Ct. 2486, 2497, 45 L. Ed. 2d 396 (1975) ("The classic example of this role is when a State undertakes to act as 'the general guardian of all infants, idiots, and lunatics.'"); Mater of Sayeh R., 91 N.Y.2d 306, 313, 693 N.E.2d 724, 727 (1997) ("[i]n its role as *parens patriae*, New York is under a powerful duty to protect its domiciliaries from harm); Matter of Maimonides Med. Ctr., 173 Misc.2d 111, 117–18, 660 N.Y.S.2d 614 (Sup. Ct. Kings Co. 1997) ("The State's *parens patriae* power vests the State with the duty to protect persons unable to care for themselves but it may not be exercised indiscriminately nor invoked to confine a non-dangerous individual solely for the purpose of providing treatment."); see also N.Y. Const., art. XVII, § 3 ("The protection and promotion of the health of the inhabitants of the state are matters of public concern and provision therefor shall be made by the state and by such of its subdivisions and in such manner, and by such means as the legislature shall from time to time determine.").

However, the affirmative use by the Plaintiff of the *parens patriae* doctrine in this context misses the mark.  The thrust of this doctrine is that of the authority and power of the

state.  See Com. of Puerto Rico ex rel. Quiros v. Bramkamp, 654 F.2d 212, 215 n.4 (2d Cir.

1981) ("The term *parens patriae* was traditionally used to refer to 'the King's power as guardian

of persons under legal disabilities to act for themselves,' which function passed to the states in

this country." (citing Hawaii, 405 U.S. at 257, 92 S. Ct. at 888-89).  In State by Abrams v. N.Y.

City Conciliation and Appeals Bd., 123 Misc.2d 47, 472 N.Y.S.2d 839 (Sup. Ct. N.Y. Cnty.

1984), the idea was explained aptly as follows:

> The concept of *parens patriae* is a judicial recognition of the inherent power of
> the state to prevent injury to those who, for whatever reason, cannot protect
> themselves.   In exercising its prerogative the state is not limited to
> representation of citizens suffering a particular disability but may bring suit to
> protect the welfare of any substantial segment of its population . . . .

123 Misc.2d at 49, 472 N.Y.S.2d 839.

The idea is that a state, in its capacity as *parens patriae*, may sue to prevent or repair

harm to its quasi-sovereign interests.  Com. of Puerto Rico, 654 F.2d at 215; see Black's Law

Dictionary 1137 (7th ed. 1999) (defining *parens patriae* as "[a] doctrine by which a government

has standing to prosecute a lawsuit on behalf of a citizen"); see also Alfred L. Snapp & Son, Inc.

v. Puerto Rico, 458 U.S. 592, 607, 102 S. Ct. 3260, 73 L. Ed. 2d 995 (1982) ("[i]n order to

maintain a [*parens patriae*] action . . . the State must be more than a nominal party"); Hawaii,

405 U.S. at 258-59, 92 S. Ct. 885 (explaining "the right of a State to sue as *parens patriae*").

Certainly, the common law doctrine of *parens patriae* has been invoked in a variety of

contexts.  Notably, the doctrine has been used as a premise of liability against a government or

other entity.  For example, "[o]ne who takes charge of a third person whom he knows or should

know to be likely to cause bodily harm to others if not controlled is under a duty to exercise

reasonable care to control the third person from doing such harm."  Restatement (Second) of

Torts at § 319; see also Saint-Guillen v. U.S., 657 F. Supp. 2d 376, 384 (E.D.N.Y. 2009); Purdy

v. Public Adm'r, 127 A.D.2d 285, 289, 514 N.Y.S.2d 407 (2d Dep't 1987), aff'd 72 N.Y.2d 1,

530 N.Y.S.2d 513, 526 N.E.2d 4 (1988) (citations omitted) ("In actions commenced by a member of the public to recover damages for injuries proximately caused by the defendant's negligent supervision of the tort-feasors, courts in this State have declined to impose liability upon a defendant who fails to restrain the tort-feasor's conduct, unless the defendant has control over the tortfeasor analogous to one in the role of *parens patriae* and the defendant knows of the tort-feasor's dangerous propensities.").

However, these cases all arise in tort; not in the quasi-contractual context. The Court has not uncovered any case in which the *parens patriae* doctrine was used by a private citizen as a sword against a government entity in a non-tort context, so that under the doctrine of restitution it is the sole premise for a legally enforceable duty. See Rest. 3d Resti. § 22 ("the fact that the claimant has taken appropriate and effective steps in response to an undoubted emergency affecting public health and safety will not prevent the defendant from asserting, as a defense to the restitution claim, that it was under no legally enforceable duty to take such steps itself"). The practical result of such a finding would be an unintended use for the doctrine. It would mean that any time a claim could be made that a task was within the authority or power of a government entity under its *parens patriae* powers to conceivably prevent a harm from occurring, a private citizen could step in to perform the duty and then be compensated from the government, with no statutory or other common law duty to point to. The Court is not prepared to extend the doctrine to such extreme lengths, especially in light of the apparent absence of any comparable precedent.

### 4. "Special Relationship"

The final potential basis for a duty of the Defendants to RP or to the public at large is that a "special relationship" existed. This idea of a "special relationship" is a theme that runs in

various types of cases.  For instance, a "special relationship" is relevant to the traditional

doctrine of a voluntary assumption of duty, which is a tort concept typically arising in connection

with negligence.  In the standard case, a plaintiff usually alleges that the defendant voluntarily

assumed a duty for the purposes of holding the defendant liable, which is clearly not applicable

here.  For example, in Newton v. City of New York, No. 07 Civ. 6211, 2010 WL 4177383

(S.D.N.Y. Oct. 22, 2010), the Plaintiff asserted that the City voluntarily assumed a duty to act on

his behalf when it initiated the search for a rape kit, necessary to establish "a special relationship

. . . between the municipality and an individual or class of persons, warranting the imposition of

a duty to use reasonable care for those persons' benefit." Id. at *2 (citations omitted).  The

Newton Court found that the plaintiff could not demonstrate that the City voluntarily agreed to

do something it was not already obligated by law to do.  Thus, because the City initiated the

search pursuant to its statutory duties, the Plaintiff could not claim there was a breach of a duty

*voluntarily* assumed.  See also Rosenthal v. Nierenberg, No. 09 Civ. 8237, 2010 WL 3290994, at

*6 (S.D.N.Y. Aug. 10, 2010) ("Rosenthal's alternative duty argument — namely, that

Nierenberg voluntarily assumed a legal duty to warn Rosenthal through defendant's series of e-

mail exchanges with other Bondy partners — is also unavailing."); Boehme v. A.P.P.L.E., 298

A.D.2d 540, 541, 749 N.Y.S.2d 49 (2d Dep't 2002) ("[T]here is no basis for the proposition that

a party may be liable for failing to follow a policy which it has adopted voluntarily, and without

legal obligation, especially when there is no showing of detrimental reliance by the plaintiff . . .

.") (citation omitted); 1A N.Y. P.J.I. 2:24-Common Law Standard of Care — Voluntarily

Assumed Duty (3d ed. 2010) ("An unkept gratuitous promise to do an act does not give rise to

liability, but one who makes such a promise and enters upon performance, is bound to perform

according to his promise, and for failure to do so is liable to anyone relying on the performance.").

Here, the "special relationship" that the parties appear to be drawing from is the exception to the general rule that there is no constitutional duty that requires state officials to protect persons from private harms.  See DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 109 S. Ct. 998, 1004, 103 L. Ed. 2d 249 (1989).  The Supreme Court has recognized this exception — the "special relationship" between an individual and the State — "[w]hen the state, through the affirmative exercise of its powers, acts to restrain an individual's freedom to act on his own behalf 'through incarceration, institutionalization, or other similar restraint of personal liberty'."  McClendon v. City of Columbia, 305 F.3d 314, 324 (5th Cir. 2002) (quoting DeShaney, 109 S. Ct. at 1005).  "The State has frequently been held liable for the consequences of its breach of duty to protect others from the acts of the mentally ill confined to State institutions."  Schrempf v. State, 66 N.Y.2d 289, 487 N.E.2d 883 (1985); see Scolavino v. State of New York, 297 N.Y. 460, 74 N.E.2d 174 (1947).  This duty has been recognized, not only in cases where the State has been negligent in permitting a mental patient to escape, see Koenigsmark v. State of New York, 55 N.Y.2d 928, 449 N.Y.S.2d 191, 434 N.E.2d 260 (1982), but also when it has been negligent in discharging a mental patient, see St. George v. State of New York, 283 App. Div. 245, 127 N.Y.S.2d 147 (3d Dep't 1954), or releasing him to outpatient care.  See Bell v. New York City Health & Hosps. Corp., 90 A.D.2d 270, 456 N.Y.S.2d 787 (2d Dep't 1982).

However, the "standard has been consistently applied in cases where it is alleged that negligent care of a mental patient by the State or one of its subdivisions has produced injury to the patient or others."  Schrempf v. State, 66 N.Y.2d 289, 487 N.E.2d 883 (1985).  See, e.g.,

Koenigsmark v. State of New York, 55 N.Y.2d 928, 449 N.Y.S.2d 191, 434 N.E.2d 260 (1982) (attempted suicide by patient after escape); Centeno v. City of New York, 40 N.Y.2d 932, 389 N.Y.S.2d 837, 358 N.E.2d 520 (1976) (suicide by patient after release); Cameron v. State of New York, 37 A.D.2d 46, 322 N.Y.S.2d 562 (4th Dep't 1971) (assault on others after release); Hirsch v. State of New York, 8 N.Y.2d 125, 202 N.Y.S.2d 296, 168 N.E.2d 372 (1960) (suicide by patient in hospital); Scolavino v. State of New York, 297 N.Y. 460, 74 N.E.2d 174 (1947) (assault on another patient).

Certainly, the power to restrain, summarily and without court process, may be exercised when "necessary to prevent the party from doing some immediate injury either to himself or others and only when the urgency of the case demands immediate intervention." Warner v. State, 297 N.Y. 395, 401, 79 N.E.2d 459 (1948); see also Matthews v. Malkus, 377 F. Supp. 2d 350, 358 (S.D.N.Y. 2005); Lauer v. State, 57 A.D.2d 673, 674, 393 N.Y.S.2d 813 (3d Dep't., 1977) (finding that where there was "a substantial and genuine concern for [plaintiff's] physical and mental well-being" plaintiff's commitment could not form the basis for an action for false arrest). However, the cases that invoke this sentiment all arise in the false imprisonment context, which is distinguishable from the case at hand.

The Court is simply not prepared to find that this duty can be used independent of any actual harm as the basis for restitutionary recovery without a single case cited by the parties, or uncovered by this Court, to support that contention. The policy ramifications of such a result could be troublesome. In its practical aspects, it could mean that a private entity could step in at any time that it believed that the government was not properly controlling an individual with possible dangerous tendencies, take that person into custody, then demand restitution for the costs of doing so. The question of who or what entities should be permitted to restrain another

and under what standards would be extremely complicated, and the Court declines to tread into these unexplored waters at this time.

### III. CONCLUSION

In sum, the Court appreciates that the JRC staff felt it would be "unconscionable to leave PR alone in a homeless shelter without adequate supervision." (Pl.'s Opp. at 6.) Thus, its action in continuing to care for RP even after the Defendants' express disclaimer of responsibility is certainly commendable. However, "[t]he law does not require that every benefit be paid for." Rest. 3d Resti. § 20. "While it may seem that there should be a remedy for every wrong, this is an ideal limited perforce by the realities of this world." Trombetta v. Conkling, 82 N.Y.2d 549, 554, 605 N.Y.S.2d 678, 626 N.E.2d 653 (1993) (internal citations omitted). "A heroic rescue may confer a benefit of inestimable value, but it is likely to be purely voluntary and altruistic in origin. The imposition of restitutionary liability in such circumstances — a principle that would become viable only when the claim was resisted — transforms an act of self-sacrifice into a contentious exchange of values. The law avoids these unedifying consequences by presuming that an emergency rescue is a gratuitous act." Id.; Cf. Goldstick v. ICM Realty, 788 F.2d 456, 467 (7th Cir. 1986) ("[W]hen a businessman confers benefits in circumstances where payment is normal and any inference of altruism can be rejected, a claim for restitution, or 'quasi-contract,' arises."). Indeed, "while the need for the service is imperative it does not follow that anyone is free to provide it in the justified expectation of reimbursement." Palmer, supra, at 374.

Nevertheless, notwithstanding the novel features in this case and the lack of clear precedence, the judgment on the pleadings filed by the Defendants is denied. Consequently, the Plaintiff may proceed with its claim for restitution. However, any potential recovery must be based narrowly upon the failure of the Defendants to comply with their duties under the relevant

state statutory provisions.  If those duties were not complied with so that RP's adult placement

was jeopardized, and JRC necessarily stepped in until the situation was resolved, then the

Plaintiff may have a viable claim for recovery.

For the foregoing reasons, it is hereby

      **ORDERED** that the Defendants' motion for judgment on the pleadings pursuant to Fed.

R. Civ. P. 12(c) is denied.

**SO ORDERED.**

Dated: Central Islip, New York
June 25, 2012

                                       _____*/s/ Arthur D. Spatt*_____
                                        ARTHUR D. SPATT
                                    United States District Judge