UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

THE JUDGE ROTENBERG EDUCATIONAL CENTER,
INC.,

                Plaintiff,
                                              **MEMORANDUM & ORDER**
            v.                                  10–CV–3628 (PKC)

GREGORY BLASS, COMISSIONER, SUFFOLK
COUNTY DEPARTMENT OF SOCIAL SERVICES,
COUNTY OF SUFFOLK,

                Defendants.
----------------------------------------------------------------x
PAMELA K. CHEN, United States District Judge:

Plaintiff The Judge Rotenberg Educational Center, Inc., ("JRC") seeks payment from Defendants Suffolk County and Suffolk County Department of Social Services ("SCDSS") for educational and housing services that the JRC provided to a disabled young woman, referred to as "RP," between December 5, 2008 and December 15, 2009. Before the Court are the parties' cross–motions for summary judgment. For the reasons discussed below, Plaintiff's motion for summary judgment is granted, and Defendant's motion for summary judgment is denied.

*BACKGROUND*

The JRC is a Massachusetts non–profit corporation that operates a residential treatment program and educational facility for children and adults with severe behavioral problems and developmental disabilities. (Pl. 56.1[1] ¶ 1.)[2] The SCDSS, *inter alia*, oversees the foster care

---

[1] Citations to "Def. 56.1" refer to Defendant's Statement of Material Facts pursuant to Local Rule 56.1. (Dkt. 99–2). Citations to "Pl. 56.1" refer to Plaintiff's Statement of Material Facts pursuant to Local Rule 56.1. (Dkt. 98–2.)

[2] The Court construes any disputed facts in the light most favorable to the non–moving party. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157–59 (1970). However, where a party either

system in Suffolk County. (*Id.* ¶ 2.) The SCDSS's Foster Care unit ordinarily tries to place foster care children in placements within New York State. (Def. 56.1 ¶ 1.)

On March 26, 2007, Suffolk County Family Court Judge Martha Luft ordered that RP, a twenty–year–old emotionally and developmentally disabled woman, be placed in the care and custody of the SCDSS. (Pl. 56.1 ¶¶ 8–10.) On April 11, 2007, the JRC agreed to care for RP.[3] (*Id.* ¶ 26.) The JRC and SCDSS entered into an Agreement for Purchase of Foster Care For Children ("Agreement")[4], in which the JRC agreed to provide housing and treatment services to RP, in return for the SCDSS paying the JRC for these services and arranging for RP's discharge from foster care when she aged out of the system.[5] (*Id.* ¶ 14.) The Agreement was to be in effect until June 30, 2008.[6] (Ex. 4 to Pl. Mem.)

---

(i) admits or (ii) denies without citing to admissible evidence facts alleged in the opposing party's Local Rule 56.1 Statement, the Court shall deem such facts undisputed. *See* Local Rules of the United States District Courts for the Southern and Eastern Districts of New York 56.1(c)–(d) ("56.1 Statement"). Thus, a standalone citation to a 56.1 Statement denotes that either the parties have, or the Court has, determined the underlying factual allegation to be undisputed. Any citations to a party's 56.1 Statement incorporates by reference the documents cited therein unless otherwise noted.

[3] From the time RP was placed in foster care until her transfer to the JRC on April 11, 2007, RP resided in several foster homes, group residences, and residential schools, and was also hospitalized a number of times after episodes of self–injurious behaviors. (Pl. 56.1 ¶ 8.)

[4] The Agreement provided an elaborate list of definitions that track New York Social Services Laws and the Office of Family and Children Services' ("OFCS") regulations. (Ex. 4 to Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment ("Pl. Mem.")). (Dkt. 98–6.)

[5] Defendants' obligations under the Agreement relating to RP's discharge included, *inter alia*, written 90–day notice of discharge from foster care; post–discharge supervision relating to RP's safety, permanency, and well–being; discharge/aftercare services; post–discharge supervision; permanency discharge planning; assistance to establish contact with service providers and community resources. (Ex. 4 to Pl. Mem.)

[6] Under New York Law, Defendants were responsible for supervising RP until her twenty–first birthday on February 28, 2008. *See* N.Y. Soc. Serv. Law § 398(6)(h) ("Commissioners of public

2

On or about March 26, 2007, RP was transported to the JRC's facilities in Massachusetts. (Ex. 3 to Pl. Mem.) RP resided at, and received services from, the JRC continuously thereafter until December 15, 2009. (Pl. 56.1 ¶ 64.) Because RP was a minor when she arrived at the JRC, she was assigned to the JRC's children's program. (Def. 56.1 ¶ 3.)

The parties agreed that after RP aged out of foster care, her needs would be best met in the adult program at the JRC. (*Id.*; Def. Opp.[7] at 10.) Accordingly, on December 7, 2007, approximately six months before RP aged out of foster care, the JRC and the SCDDS filed paperwork with the New York State Office of Persons with Developmental Disabilities ("OPWDD"), seeking funding for adult social services for RP. (Pl. 56.1 ¶ 27.) In April 2008, RP was found ineligible for adult funding by the OPWDD. (*Id.* ¶ 28.) On May 19, 2008, Defendants were notified that RP was again denied OPWDD services in a second step review. (*Id.* ¶ 29.) On June 25, 2008, the OPWDD denied services to RP in its last step review. (*Id.* ¶ 30.) Five days later, on June 30, RP aged out of the foster care system. (*Id.* ¶ 31.)

The SCDSS subsequently submitted a request for an administrative fair hearing before the New York Department of Health to challenge the OPWDD's decision denying RP funding for adult social services. (*Id.* ¶ 33; Ex. 6 to Pl. Mem.) The OPWDD agreed to pay the JRC for the services it was providing RP, pending the outcome of the appeal. (Pl. 56.1 ¶ 34; Def. 56.1 ¶ 7.) On September 9, 2008, the JRC sent a report to the New York Office of Mental Health

---

welfare and city public welfare officers responsible under the provisions of a special or local law for the children hereinafter specified shall have powers and perform duties as follows: . . . Supervise children who have been cared for away from their families until such children become twenty–one years of age or until they are discharged to their own parents, relatives within the third degree or guardians, or adopted."). However, the Agreement stipulated that the Defendants' financial responsibility for funding RP's stay at the JRC ceased on June 30, 2008, the date when the JRC vocational program school year ended. (Ex. 4 to Pl. Mem.)

[7] Citations to "Def. Opp." refer to Defendant's Memorandum of Law in Support of Cross–Motion & In Opposition to Plaintiff's Motion for Summary Judgement, filed 3/10/14. (Dkt. 99.)

("OMH"), stating that RP was in need of adult services and a residential placement. (Pl. 56.1 ¶ 35.) In September 2008, the JRC and SCDSS were notified by the OMH that no housing was available for RP, but that the JRC would be notified of any future openings. (*Id.* ¶ 36.)

On October 21, 2008, an administrative hearing was held to reconsider the OPWDD's denial of RP's eligibility to receive services. (*Id.* ¶ 38.) On December 5, 2008, the New York State Department of Health's Commissioner Designee rendered his decision denying RP Medicaid eligibility to receive adult residential placement and treatment services through OPWDD.[8] (*Id.* ¶ 41.) On January 12, 2009, the OPWDD notified the JRC that it would not take responsibility for RP's care. (*Id.* ¶ 43.) The same day, the JRC staff contacted the SCDSS and conveyed the OPWDD's adverse decision. (3d Am. Compl.[9] ¶ 38.) The SCDSS caseworker instructed the JRC staff to bring RP to the SCDSS's office in New York. (Pl. 56.1 ¶ 46.) Plaintiff alleges that it assumed that RP was going to be placed in a new permanent placement once she returned to New York. (Poisson Aff.[10] ¶ 9.)

On January 14, 2009, JRC staff members accompanied RP to the SCDSS's office. (Pl. 56.1 ¶ 48.) The SCDSS caseworker told the JRC staff that there was no placement for RP, and

---

[8] Defendants note that the I.Q. threshold for applicants to qualify for adult services changed just before RP applied for OPWDD funding. According to Defendants, RP's I.Q. made her too high functioning to be eligible for an adult placement out–of–state funded by OPWDD. (Def. Opp. at 18.)

[9] Citations to "3d Am. Compl." refer to Plaintiff's Third Verified Amended Complaint, dated 1/11/13. (Dkt. 76.)

[10] Citations to "Poisson Aff." refer to the Affidavit of Nicole Poisson in Support of Plaintiff's Motion for Summary Judgment, dated 2/14/14. (Ex. 34 to Pl. Mem.)

4

instructed them to take RP to a homeless shelter.[11] (*Id.* ¶¶ 49.) Plaintiff claims that upon hearing this news, RP became "extremely agitated, [began] crying, and in a loud voice stat[ed] that she would not go." (Poisson Aff. ¶ 13.) Plaintiff alleges that it would have been unsafe and inappropriate to leave RP in a homeless shelter without adequate supervision. (Pl. 56.1 ¶ 52.) Defendants claim that while its discharge plan may have included the temporary use of emergency housing resources, such as an overnight placement facility or a homeless shelter, there would have been adequate supervision. (Def. 56. 1 ¶¶ 6, 21.) Defendants also state that they did not anticipate a final discharge to a homeless shelter and that the Suffolk County Adult Protective Services ("APS") would have opened a case for RP and begun the process of obtaining an OMH placement with the adult services program. (*Id.* ¶¶ 4, 21.)

Instead of taking RP to the homeless shelter, the JRC staff transported RP back to the JRC's facilities in Massachusetts until the Defendants located suitable housing for RP. (Pl. 56.1 ¶ 53.) According to Defendants, the JRC did not inform the SCDSS that they were taking RP back to Massachusetts. (Def. 56.1 ¶¶ 28, 30.) In addition, Defendants claim that the JRC staff did not seek any clarification from Defendants concerning the specifics of the anticipated use of emergency housing or a supervised homeless shelter for RP, pending the identification of a permanent adult placement. (*Id.* ¶ 29.)

The JRC notified the Court Examiner Specialist of the Suffolk County Model Guardianship Part ("Guardianship Part")[12] that RP had been essentially abandoned by the SCDSS at the JRC. (Pl. 56.1 ¶ 57.) On March 16, 2009, the Director of the JRC filed a petition under Mental Hygiene Law Article 81 ("Article 81 Proceeding") in Suffolk County Supreme

---

[11] While there is no material dispute about what happened at the SCDSS's office, the parties dispute whether Plaintiff was aware, or should have been aware, that RP would be transported to emergency housing at a supervised homeless shelter. (Def. 56.1 ¶ 27; Poisson Aff. ¶ 12.)
[12] The Guardianship Part is a division within the Suffolk County Family Court system.

5

Court, seeking the appointment of a special guardian to appeal the OPWDD's denial of eligibility, and of a permanent guardian to act as an adult community resource person to assist RP with her transition back to New York. (*Id.* ¶ 58.) The same day, the Guardianship Part judge signed an Order to Show Cause appointing a special temporary guardian for RP, for purposes of filing a CPLR Article 78 Notice of Petition to appeal the denial of RP's eligibility to receive OPWDD services. (*Id.* ¶ 59.) On April 13, 2009, the Court appointed a guardian for RP. (*Id.* ¶ 60.)

The JRC incurred legal expenses by commencing the Article 81 Proceeding. (*Id.* ¶ 61.) The JRC made it known to all parties involved in RP's case, including Defendants, that it was expecting compensation for the services it was providing RP until a suitable placement was found for RP. (*Id.* ¶ 63.)

RP remained at the JRC until December 15, 2009, when she was discharged to a community residence in Suffolk County. (*Id.* ¶ 64.) The same day, the JRC sent a statement to the SCDSS and Suffolk County detailing $245,787 in unpaid tuition charges for RP for the period from December 5, 2008 to December 15, 2009. (*Id.* ¶ 65; 3d Am. Compl., at p. 19–20.) On April 29, 2010, the JRC sent a demand letter to the SCDSS requesting payment for the services provided to RP. (3d Am. Compl. ¶ 52.) Neither Suffolk County nor the SCDSS has paid the invoice sent by the JRC.[13]

---

[13] In an email exchange between Dean Schnetzer, former SCDSS Division of Children & Family Services Administrator, and Gregory Blass, Commissioner of the SCDSS, dated July 28, 2009, Blass stated that the SCDSS would bear the responsibility of paying the JRC for RP's stay from December 2008 until OMH found a placement for her. (Ex. 20 to Pl. Mem.; Dkt. 89 at 13.) When asked during deposition why the JRC bill was not paid, Blass testified, "I don't know what happened. I honestly don't know." (Deposition of Gregory Blass, dated 8/14/13, at 38:20–21.) (Dkt. 98–23.) Blass speculated that this matter was delegated to the finance division. (*Id.* at 38:21–24.)

On May 18, 2010, RP's special temporary guardian applied to the Guardianship Part judge to discontinue RP's Article 78 appeal of the OPWDD's denial of funding because RP was already in a community residence. (Pl. 56.1 ¶ 68). Over the JRC's objection, the application was granted. (*Id.* ¶ 69.)

*DISCUSSION*

I.  **Summary Judgment Standard**

The standard for summary judgment is well established. Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FRCP 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–252 (1986). "The moving party bears the burden of establishing the absence of any genuine issue of material fact," *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010); *see Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006), after which the burden shifts to the nonmoving party to "come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011); *see also F.D.I.C. v. Great American Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The nonmoving party can only defeat summary judgment "by coming forward with evidence that would be sufficient, if all reasonable inferences were drawn in [its] favor, to establish the existence of" a factual question that must be resolved at trial. *Spinelli v. City of N.Y.*, 579 F.3d 160, 167 (2d Cir. 2009) (internal quotations and citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The mere existence of a scintilla of evidence in support of the [non–movant's] position will be insufficient; there must be evidence

on which the jury could reasonably find for the [non–movant]." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003) (quoting *Anderson*, 477 U.S. at 252); *see also Lyons v. Lancer Ins. Co.*, 681 F.3d 50, 56–57 (2d Cir. 2012); *Jeffreys v. City of N.Y.*, 426 F.3d 549, 554 (2d Cir. 2005). The nonmoving party cannot avoid summary judgment simply by relying "on conclusory allegations or unsubstantiated speculation," *Jeffreys*, 426 F.3d at 554 (quotations and citations omitted); *see also DeFabio v. East Hampton Union Free Sch. Dist.*, 623 F.3d 71, 81 (2d Cir. 2010); and must offer "some hard evidence showing that its version of the events is not wholly fanciful." *Miner v. Clinton Cnty.*, 541 F.3d 464, 471 (2d Cir. 2008). In determining whether a genuine issue of fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props.*, *Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).

## II. Restitution

In this case, Plaintiff asserts a cause of action arising under the doctrine of restitution. Plaintiff argues that it is entitled to restitution because (1) Defendants owed RP a duty, both under the Agreement and several state statutes, to prepare for her discharge from foster care; (2) Defendants breached this duty of care; and (3) Defendants created an emergency situation that placed the JRC in a position where it had to act immediately to prevent RP from being harmed or harming others.

As articulated by the Restatement (Third) of Restitution and Unjust Enrichment, ("Rest. 3d. Rest."), "a claimant who acts properly to perform the defendant's duty in an emergency threatening public health or safety has a claim in restitution to recover the reasonable cost of performance, even if the defendant has denied liability and rejected the claimant's services."

8

Rest. 3d. Rest. § 22 cmt. a, (2011). Where a plaintiff is entitled to restitution for performing a duty of the defendant, it is governed by the following considerations:

> (1) A person who performs another's duty to a third person or to the public is entitled to restitution from the other as necessary to prevent unjust enrichment, if the circumstances justify the decision to intervene without request.
>
> (2) Unrequested intervention may be justified in the following circumstances:
> . . .
> (b) the claimant may be justified in performing another's duty to furnish necessaries to a third person, to avoid imminent harm to the interests of the third person; and
> (c) the claimant may be justified in performing another's duty to the public, if performance is urgently required for the protection of public health, safety, or general welfare.

*Id.* § 22.[14]

According to the Restatement, the plaintiff must establish the following four elements: (1) a duty was owed to a third person; (2) there was a degree of urgency; (3) there was some obstacle to a prior agreement; and (4) the performance of another's duty without request when the [plaintiff] is a proper party to intervene. (*Id.*) Here, there is no dispute that the last three elements are established. First, there was an emergency situation, *i.e.*, that RP was going to be left at a homeless shelter or other emergency housing until appropriate longer–term housing could be secured. Given RP's history of aggression and violence, the JRC had a reasonable concern about RP's safety and the safety of those around her. Second, there was an obstacle to the prior agreement between the JRC and SCDSS, since Defendants not only disclaimed any responsibility for RP, but expressly directed that she be taken to the homeless shelter. Third, the

---

[14] The Court notes that a restitution claim under Restatement (First) of Restitution §§ 112–15 (1937) could also be made here. However, since the Rest. 3d Rest. § 22, discussed *supra*, combines the rules stated in Restatement (First) of Restitution §§ 112–15, a separate analysis is not necessary.

JRC was an appropriate party to intervene, as it was the institution that had been housing and providing services to RP for over a year prior to the emergency that arose on January 14, 2009.

The main inquiry here is whether Defendants owed a duty to RP and/or the public under the particular circumstances of this case.[15] "Duty is a flexible concept. Its existence depends on calibrating legal obligations to factual contexts." *Consol. Edison Co. of New York*, 580 F.2d at 1127. It is clear that Defendants had a duty, imposed by contract, statutes and regulations, to assist RP in her transition from foster care to an adult placement facility. Defendants' breach of their duty created an emergency situation that the JRC mitigated, creating a basis for restitutionary recovery. The Court will analyze Defendants' duty to RP under the Agreement and the relevant state statutes and regulations, and Defendants' breach of that duty.

### A. The Agreement Between the JRC and SCDSS

Under the plain terms of the Agreement, Defendants owed RP, a third–party beneficiary of the Agreement, a duty to prepare for her transition out of foster care. Defendants breached this duty by failing to (1) provide RP with an adequate permanency discharge plan; (2) issue written notice of discharge ninety days prior to RP's discharge from foster care; (3) appoint a community resource person to assist RP with her transition from foster care; (4) and provide RP with proper post–discharge supervision.

---

[15] *See* Rest. 3d Rest. § 22 cmt. h ("As with any claim under § 22, a recovery under subsection (2)(c) is restricted to expenditures that discharge a duty of the defendant as opposed to a duty of someone else."); *id.* ("If *the defendant's duty,* the existence of an emergency, the benefits of the claimant's intervention, and the impossibility of action by the defendant are all clear, the claimant's entitlement to restitution is clear as well.") (emphasis added); *United States v. Consol. Edison Co. of New York*, 580 F.2d 1122, 1127 (2d Cir. 1978) ("The basis for recovery in this case is that the [United States] performed Con Edison's duty to acquire and maintain adequate supplies of electrical power under emergency conditions with the clear intent that it be reimbursed for its costs.").

*1. Defendants' Failure to Provide RP with Proper Permanency Discharge Planning*

Under the Agreement, Defendants owed RP a duty to provide her with proper permanency discharge planning. (Ex. 4 to Pl. Mem.) Defendants argue that it had a permanent discharge plan, namely, that RP would receive funding from OPWDD, allowing her to transition into the JRC's adult program after she aged out of the foster care system, at which point the SCDSS's role would have ended. (Def. Opp. at 13.) However, Defendants' obligation to conduct permanency discharge planning under the Agreement was not contingent upon RP receiving OPWDD funding. Defendants, therefore, were not relieved of their duty to provide RP with a proper permanency discharge plan because OPWDD funding was denied or simply because Defendants sought OPWDD funding for RP.

Furthermore, Defendants had notice of the possibility that OPWDD funding would be denied and ample time to prepare an alternate discharge plan for RP that did not require these funds. RP was first denied OPWDD funding in April 2008 ("April Decision"), approximately two months before RP aged out of foster care, and approximately eight months prior to the OPWDD's final denial of funding.[16] The April Decision put the SCDSS on notice of the need to make alternate and/or contingent plans for RP's transition. Defendants' failure to demonstrate any serious attempt to prepare for RP's discharge from foster care after the April Decision was a clear violation of the Agreement.

---

[16] As discussed, the OPWDD paid for RP's services at the JRC pending its final decision.

## 2. Defendants' Failure to Provide a Discharge Notice

Under both the Agreement and state regulations[17], Defendants owed RP a duty to provide her with a written notice of discharge ("Discharge Notice") at least ninety days prior to her discharge from foster care. (Ex. 4 to Pl. Mem.) The Discharge Notice was intended to establish a plan to address issues relating to RP's safety, permanency, and well–being upon her discharge from foster care.[18] (Pl. Mem. at 17–18.) Defendants claim that by the time the OPWDD finally denied funding in December 2008, RP had already aged out of foster care, and thus, it was "not feasible for defendants to prepare the 90 day discharge notice."[19] (Def. Opp. at 13–14.)

---

[17] Under 18 NYCRR § 430.12, Defendants are required to submit written notice of discharge at least ninety days prior to the day of discharge and to issue a transition plan ninety days prior to the scheduled discharge date that included "specific options on housing, health insurance, education, local opportunities for mentors and continuing support services, and work force supports and employment services. The transition plan must be as detailed as the foster child may elect." *Id.* at §§ 430.12(f),(j).

[18] Under the Agreement, the Discharge Notice addressees the following issues relating to RP's safety, permanency, and well–being: (1) appropriate housing that is expected to be available for at least 12 months from the date of discharge is secured; (2) RP has sufficient income; (3) medical assistance coverage is available upon discharge; (4) arrangements have been made for RP to receive documents such as a birth certificate, social security card, medical records, and education records at the time of discharge; (4) an adult permanency resource is available or is being sought to provide emotional guidance upon her discharge; (5) any safety concerns related to her discharge from foster care are being addressed; and (6) arrangements have been made with service providers for services that she will need upon discharge. (Pl. Mem. at 17–18.) Although Plaintiff failed to provide the portion of the Agreement that addresses the Discharge Notice, Defendants have not objected to Plaintiff's representation or provided the full agreement. Therefore, the Court accepts as undisputed Plaintiff's representation of these provisions.

[19] Defendants also argue in the alternative, claiming that the SCDDS provided written notification to RP of her imminent discharge from foster care services at least 90 days before discharge as required by the Agreement and OFCS regulations. According to Defendants, the notice requirement "was substantially complied with in the form of the submission of the permanency hearing checklist and report to Suffolk County Family Court on or about October 16, 2007, months in advance of RP's reaching the age of 21 in February 2008 and the end of the educational/vocational program at JRC in June 2008." (Dennis Nowak's Affidavit in support of Defendants' Memorandum of Law in Support of Cross–Motion & In Opposition to Plaintiff's Motion for Summary Judgment ("Nowak Aff."), dated 4/9/14, at ¶ 15.) (Dkt. 99–25.) However, this checklist does not satisfy the requirements of the Agreement and OFCS Reg. 18 NYCRR §§

This is the same faulty reasoning that the Court rejected with respect to the Defendants' duty to prepare a discharge plan for RP. Again, Defendants' assumption that RP would receive OPWDD funding did not relieve them of their duty to prepare the Discharge Notice. Neither the Agreement nor OFCS Regulations provide for an exception to the Discharge Notice requirement based on the denial of OPWDD funding, regardless of when that decision is finalized. Therefore, under the terms of the Agreement and state regulations, Defendants breached their duty by failing to prepare the Discharge Notice ninety days before RP aged out of foster care.[20]

Defendants argue that even if they did not timely or properly provide RP with the Discharge Notice, it did not prejudice RP or the JRC in any way. (Def. Opp. at 13–14.) However, Defendants' violation of its duty to prepare the Discharge Notice, and the accompanying transition plan, contributed directly to the urgent situation faced by RP on January 14, 2009, when the only housing option available to her was a homeless shelter or similar emergency housing, with few or no social services to assist her in transitioning out of foster care. If Defendants had timely and properly issued the Discharge Notice, there could have been alternate arrangements in place for RP in the event OPWDD funding was denied, as happened, and the urgent situation that required the JRC to act would have been avoided.

### 3. Defendants' Failure to Appoint an Adult Community Resource Person

Plaintiff also alleges that Defendants breached its duty to appoint an adult community resource person to assist in the caring, aiding, and planning for RP's transition from foster care,

---

430.12(f), (j). Therefore, Defendants breached its duty to RP by neglecting to submit a proper Discharge Notice.

[20] Further, RP was first denied funding from OPWDD in April 2008, approximately two months before RP aged out of foster care. At the very least, this should have put Defendants on notice that RP may not be eligible for OPWDD funding and that they would need to find alternative, appropriate placement for her prior to June 30, 2008.

as required by the Agreement. Defendants argue that the JRC was RP's community resource person after she was discharged from foster care in 2008, and that the JRC failed to care, aid, and, plan RP's transition from foster care. (Def. Opp. at 11; Nowak Aff. ¶¶ 21–24.) However, the Agreement clearly dictates that Defendants, not the JRC, were responsible for RP's discharge planning. (Ex. 4 to Pl. Mem.) Thus, the SCDSS bore the responsibility of appointing an adult community resource person *prior* to RP's discharge from foster care, and its failure to do so was a violation of the Agreement. The fact that Defendants did not provide RP with a community resource person is particularly alarming given that she had no family, friends, or responsible adults to advocate for her, thereby necessitating the JRC's intervention to seek the appointment of a guardian to assist RP in transitioning from foster care to a suitable adult placement.

4. *Defendants' Failure to Provide Proper Post–Discharge Supervision*

Defendants also breached their duty under the Agreement to provide RP with proper post–discharge supervision. Here, post–discharge supervision of RP was crucial to protect not only RP, but members of the public who would be coming into contact with her, particularly those unaware of RP's disabilities, which, at times, manifested as aggression and violent behavior. (3d Am. Compl., ¶¶ 41, 60; Ex. 1 to Pl. Mem.) Defendants knew as early as April 2008 that RP may not be eligible for OPWDD funding, but sat idly by, awaiting the OPWDD's final decision. As a result, when the OPWDD denied RP's benefits in December 2008, RP had already aged out of foster care, without a proper plan for her post–discharge supervision.

Defendants argue that there would have been adequate supervision at the homeless shelter, and that she would not have been permanently discharged there. (Def. Opp. at 16.) However, the Court is not persuaded that the type or level of alleged supervision in a homeless shelter satisfies the terms of the Agreement, even if RP remained there only for a short time.

14

Given RP's history of aggression and violent behavior, Defendants should have engaged in more thorough planning to assure that RP was supervised in a manner that would not endanger her safety and the safety of those around her. Defendants' failure to arrange for adequate post–discharge supervision for RP created an urgent situation in which JRC interceded to care for RP until more suitable housing could be located.

### B. Defendants' Violation of Social Services Law § 398

Social Services Law § 398 requires that, when a foster child is placed outside of New York state, the social services official in charge, such as the Commissioner of SCDSS, must submit a report on the child's needs for services after she reaches the age of twenty–one in anticipation of her return to New York, if the Commissioner determines that the child will need services as an adult. Specifically, it states:

> 13. (a) In the case of a child with a handicapping condition who is placed, pursuant to this chapter, in a foster care agency or institution located outside the state, and who attains the age of eighteen, the social services official shall:
>
> (i) determine whether such child will need services after the age of twenty–one, and, if such need exists;
> (ii) assess the nature of the services required;
> . . .
> (b) Upon the written consent of the parent or guardian, the department shall submit the report received pursuant to paragraph (a) of this subdivision to the council on children and families.
>
> (c) When a child's report is submitted to the council on children and families pursuant to this subdivision, the council shall cooperate with adult service providers, such as the department of social services, the office of mental retardation and developmental disabilities, the office of mental health and the office of vocational rehabilitation of the education department in planning and coordinating such child's return to New York state for adult services. The council shall arrange with the appropriate state agency for the development of a recommendation of all appropriate in–state programs operated, licensed, certified or authorized by such agency and which may be available when such child attains the age of twenty–one. . . .

N.Y. Soc. Servs. Law § 398(13).

There is no dispute that RP needed adult services after she turned twenty–one. (Def. 56.1 ¶ 3; Def. Opp. at 10.) Accordingly, pursuant to Social Services Law § 398, Defendants had a duty to submit a report on RP's needs for services ("Report") after she reached the age of twenty–one to the Council on Children and Families ("COCF"). Defendants concede that they did not send the Report to the COCF.[21] (Def. Opp. at 15.) However, Defendants argue that this error alone did not cause the delay in locating and obtaining RP an adult placement within Suffolk County. (*Id.*)

While this particular error may not have been the sole cause of the delay in finding RP an adult placement, Defendants understate the negative impact of their failure to send the Report to the COCF. Defendants ignore the importance of the COCF in cooperating with the appropriate state agency to plan and coordinate a child's return to New York State for adult services. The COCF acts as a safety net when situations arise, as in RP's case, where the individual is hard to place and where eligibility issues arise between OPWDD and OMH. Defendants contend that the COCF's ability to coordinate SCDSS's efforts with those of state agencies is "aspirational in nature, requires cooperation of all parties and has no apparent enforcement authority." (Def. Opp. at 15.) Regardless of Defendants' view of the efficacy of the COCF, which the Court does not adopt, Defendants cannot deny that they had a statutory duty to send the Report to the COCF, and they breached that duty when they failed to do so.

**C. Another Planned Permanent Living Arrangement ("APPLA")**

On October 16, 2007, Judge Luft ordered that RP be discharged from foster care to APPLA, with a permanency resource person designated by SCDSS (other than LP, RP's

---

[21] Instead, on December 7, 2007, Defendants sent a Report to the Long Island Developmental Disabilities Services Offices ("LIDDSO"), OPWDD's regional office. (Pl. 56.1 ¶ 27.) However, under Social Services Law § 398, Defendants were required to send the Report to the COCF, not LIDDSO.

mother), and in the interim, RP could remain at the JRC. (3d Am. Compl. ¶¶ 20–21.) APPLA is a "permanency planning goal to assist foster care youth in their transition to self–sufficiency by connecting the youth to an adult permanency resource, equipping the youth with life skills and, upon discharge, connecting the youth with any needed community and/or specialized services." 18 NYCRR § 430.12(f). APPLA sets forth the rules and regulations the SCDSS and other local districts must adhere to in preparing for the discharge of a child from the foster care system to APPLA. APPLA, *inter alia*, provides the following:

> No child may be discharged to another planned living arrangement with a permanency resource, unless the child has a residence other than a shelter for adults, shelter for families, single–room occupancy hotel or any other congregate living arrangement which houses more than 10 unrelated persons and there is a reasonable expectation that the residence will remain available to the child for at least the first 12 months after discharge.

*Id.* at § 430.12(f)(3)(i)(c).

Under APPLA, Defendants were prohibited from discharging RP from foster care to a shelter, single room occupancy hotel or any other housing situation that was not reasonably expected to last for more than one year. "These restrictions are an important tool in preventing the poor outcomes that characterize former foster youth around the country. . . including lower high school graduation rates, higher unemployment rates, increased rates of incarceration, and disproportionally high representation among the homeless population."[22] Defendants' decision to discharge RP to a shelter, even if for a brief period, was a direct violation of Defendants' clear duty under APPLA. From a policy perspective, permitting Defendants to discharge RP to a homeless shelter because they failed to adequately prepare for her discharge before she aged out of foster care would create a perverse incentive for social service districts or agencies to shirk their responsibility to assist disabled individuals obtain stable housing once they age out of foster

---

[22] Brief for Lawyer for Children as Amicus Curiae Supporting Plaintiff, at 2.

care. It would also establish a precedent that it is permissible to discharge a youth who ages out of foster care to a homeless shelter, which would undermine the very protections that APPLA was intended to guarantee. Accordingly, the Court finds that Defendants must be held accountable for violating its duty under APPLA.

### III. Plaintiff is Entitled To Restitution

Plaintiff has established its entitlement to restitution. Defendants owed RP a duty under the Agreement, as well as state statutory and regulatory law, to prepare for her discharge from foster care. Defendants breached that duty, thereby jeopardizing RP's adult placement, her safety, health and well–being, and the safety of the community. There was an obstacle to the prior agreement between the parties, based on Defendants' disavowal of responsibility for RP, and their plan to send RP to a homeless shelter or emergency housing. The JRC was the appropriate party to intervene, and it performed Defendants' duty in a swift and efficient manner to protect the safety of RP, the public, and innocent third parties. The JRC housed and educated RP until the situation was resolved and appropriate housing was found.[23] From the record, it appears that Defendants made no objections to RP remaining at the JRC until a community placement was located. (Pl. 56.1 ¶ 62.) Accordingly, Plaintiff is entitled to $245,787, the cost of RP's tuition from December 5, 2008, when the OPWDD issued its final decision denying RP's benefits, to December 15, 2009, when RP was discharged to a community residence in Suffolk County.

---

[23] Defendants argue that Plaintiff merely volunteered to hold RP at its facility with the expectation that OPWDD's finding of ineligibility would be overturned, which would provide the funding for RP's placement at the JRC. (Def. Opp. at 24–25.) However, the record clearly establishes that the JRC did not voluntarily intervene for altruistic reasons, but rather, was compelled to do so because of Defendants' failure to comply with its legal duty to protect public health and welfare. *See* Rest. 3d Rest. § 22.

After assuming the duty owed by Defendants to RP, the JRC filed an Article 81 Proceeding seeking the appointment of a guardian to support RP in her transition from foster care to a suitable adult placement. It was reasonable, if not necessary, for the JRC to seek the appointment of a guardian based on RP's disabilities and the absence of any advocate for RP to assist her in finding adult services and residential placement in New York. The costs of the Article 81 proceeding were incurred solely by the JRC, and as a result, it is entitled to restitution for reasonable attorneys' fees and costs associated with the Article 81 Proceeding.

*CONCLUSION*

For the reasons discussed herein, Plaintiff's motion for summary judgment is granted, and Defendants' motion is denied. JRC is entitled to compensation in the amount of $245,787 in unpaid tuition charges for RP from December 5, 2008, to December 15, 2009, as well as reasonable attorneys' fees and costs relating to the Article 81 proceeding. By April 9, 2015, Plaintiff will file an accounting of the attorneys' fees and costs it seeks to recover in connection with the Article 81 proceeding. Defendants shall submit any objections to the amount requested by Plaintiff by April 23, 2015.

SO ORDERED:

   /s Pamela K. Chen
PAMELA K. CHEN
United States District Judge

Dated: March 26, 2015
      Brooklyn, New York